# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | EP-18-CR-01661-DCG |
| JONATHAN MOISES RAMIREZ | § § | |

## ORDER

Presently before the Court is Defendant Jonathan Moises Ramirez' "Motion to Suppress Evidence" (ECF No. 25) filed on September 10, 2018. On October 17, 2018, the Court held an evidentiary hearing on the Motion where the parties presented their witnesses. *See* ECF No. 35. For the reasons that follow, the Court **GRANTS** Defendant's Motion.

## I. BACKGROUND

On or about May 17, 2018, Defendant was at the Speaking Rock Entertainment Center (the "Entertainment Center") located in El Paso, Texas, on the Ysleta Del Sur Pueblo ("YDSP") reservation. Mot. at 1. At approximately 3:00 A.M. on that date, Defendant decided to briefly leave the Entertainment Center in a vehicle that he borrowed from his girlfriend. *Id.*; Suppression Hr'g Tr. 10:25–12:18. As Defendant walked to his vehicle, a woman, flanked by a group of people, approached and began harassing him. Mot. at 1; Suppression Hr'g Tr. 45:8–46:17. Defendant attempted to distance himself from her and deescalate the situation, but the woman persisted with her harassment. Mot. at 1. Eventually, the woman turned and started walking away. *Id.* at 2. YDSP Officers Castillo and Alarcon, who were working in the surveillance department observing the surveillance cameras, noticed the altercation and witnessed, as the woman and her group were walking away, Defendant pick up what appeared to

be a rifle after opening the driver-side door to his vehicle. Govt.'s Am. Resp. at 1–2, ECF No. 27. Defendant then entered the vehicle and drove away to an unknown destination. *Id.* at 2.

Nevertheless, Defendant returned to the Entertainment Center about 15 minutes later. Suppression Hr'g Tr. 29:13–20. After Defendant returned, Officer Alarcon approached Defendant's vehicle and observed a rifle in plain view inside the vehicle. Govt.'s Am. Resp. at 2. After observing the rifle, YDSP Police Sergeant Velasco instructed the tribal officers, Officers Alarcon and Castillo, to take Defendant into custody. Mot. at 2; Suppression Hr'g Tr. 59:4–60:14; *id.* 124:7–14. At around 3:36 A.M., the tribal officers approached Defendant in the main area of the Entertainment Center. Mot. at 2; Govt.'s Am. Resp. at 2. Defendant was seated playing a game. Suppression Hr'g Tr. 77:18–20. As the tribal officers approached Defendant, Officer Castillo drew his weapon while Officer Alarcon grabbed Defendant to try and lift him out of the chair in order to handcuff him. Govt.'s Am. Resp. at 2; Suppression Hr'g Tr. 77:21–78:2; *id.* 122:1–124:6. However, Defendant pulled away, attempted to flee, and was taken to the ground and subdued by the tribal officers. Govt.'s Am. Resp. at 2. The force of the arrest caused Defendant to suffer a broken arm and a dislocated elbow. Mot. at 2.

After arresting Defendant, the tribal officers took him to the Security Supervisor Office, searched Defendant for weapons, and found a knife and plastic baggies containing illicit controlled substances. Govt.'s Am. Resp. at 2–3. Subsequently, Officer Alarcon conducted a search of Defendant's vehicle and discovered two rifles, a shotgun, and illicit controlled substances therein. *Id.* at 3; Mot. at 3. Due to the injuries to Defendant's arm, a YDSP officer transported him to Del Sol Hospital for treatment around 4:36 A.M. Govt.'s Am. Resp. at 3. While Defendant was at the hospital, YDSP officers learned that he was a convicted felon, so

they referred the case to the Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). *Id.*

After being treated, Defendant was transported to YDSP Tribal Police Headquarters around 7:40 A.M. *Id.* After he arrived, ATF Special Agent Keith Rodriguez met with Defendant, advised him of his Miranda rights, and interrogated Defendant after he waived his Miranda rights. *Id.* Defendant made statements to Special Agent Rodriguez conceding that he possessed the firearms and admitting that he had another weapon in his motel room. *Id.* ATF agents searched Defendant's motel room and discovered an additional firearm. *Id.* On June 13, 2018, the government issued a one-count indictment charging Defendant with Possession of a Firearm by a Convicted Felon. Indictment at 1, ECF No. 10.

## II. STANDARD

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). However, in certain situations, the burden of persuasion shifts to the government. *Id.* For example, "[w]hen the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). Further, the government also bears the burden of proving that a confession obtained during custodial interrogation is admissible. *Taylor v. Alabama*, 457 U.S. 687, 690 (1982); *de la Fuente*, 548 F.2d at 533. However, in order to shift the burden to the government, the defendant must first discharge his initial burden of producing some evidence, based on specific factual allegations, sufficient to make a prima facie showing of illegality. *United States v. Lyons*, 31 F. App'x 833 (5th Cir. 2002).

## III. DISCUSSION

By his Motion, Defendant seeks to exclude all physical and testimonial evidence derived and flowing from his allegedly illegal seizure and arrest. Mot. at 10. Defendant's basis for his Motion is the Fourth Amendment to the United States Constitution, *Bond v. United States*, 529 U.S. 334, 336 (2000) ("The Fourth Amendment provides that '[t]he right of the people to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" (quoting U.S. Const. amend. IV)), and the exclusionary rule, *Segura v. United States*, 468 U.S. 796, 804 (1984) ("The suppression or exclusionary rule is a judicially prescribed remedial measure [that] . . . reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" (internal citations omitted)). This case presents the Court with four determinative questions:

1) Did the tribal officers have reasonable suspicion to detain and question Defendant?

2) Did the tribal officers effectuate an illegal arrest?

3) Did the tribal officers perform an illegal search of Defendant's automobile?

4) Were the statements to ATF Special Agent Rodriguez fruits of the poisonous tree?

The Court will address each of these questions in turn.

### A. Reasonable Suspicion

Defendant argues that the tribal officers did not have reasonable suspicion to believe a crime was afoot. Def.'s Brief at 1, ECF No. 43. The government counters that the tribal officers did have reasonable suspicion based on YDSP Peace Code § 4.4.010(D),[1] YDSP Peace Code §

---

[1] The Peace Code states: "A person commits the civil infraction of Disorderly Conduct if he [n]ot being lawfully authorized to do so, displays a dangerous weapon in a tribal place in a manner calculated to alarm." YDSP Peace Code § 4.4.010(D).

4.4.020,[2] and Texas Penal Code § 42.01(8).[3] Govt.'s Am. Resp. at 5–6; Govt.'s Resp. Brief at 3–5, ECF No. 44. Officer Castillo testified that the tribal officers had reasonable suspicion to believe that Defendant violated YDSP Peace Code § 4.4.010(D) when he picked up the rifle in his car; in contrast, Officer Alarcon testified that they had reasonable suspicion to believe that Defendant violated YDSP Peace Code § 4.4.020. *See* Suppression Hr'g Tr. 60:20–25 (Officer Castillo's testimony); *id.* 137:23–138:1 (Officer Alarcon's testimony). The Court holds that the tribal officers did have reasonable suspicion to believe that Defendant violated YDSP Peace Code § 4.4.020.[4]

---

[2] The Code explains: "A person commits the civil infraction of Carrying a Prohibited Weapon if he bears or carries on or about his person [o]ther dangerous weapons as defined." YDSP Peace Code § 4.4.020(C). The Peace Code defines a dangerous weapon as "any firearm, or other weapon, device instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury." YDSP Peace Code § 4.4.023.

[3] The Texas Penal Code specifies: "A person commits an offense if he intentionally or knowingly displays a firearm or other deadly weapon in a public place in a manner calculated to alarm." Texas Penal Code § 42.01(8).

[4] There is a potential open question regarding whether the YDSP Peace Code could ever provide reasonable suspicion because it is not a criminal code. Instead, the YDSP Peace Code lays out civil infractions for which only civil assessments or exclusion from the reservation are remedies. *See* YDSP Peace Code §§ 4.2.010–4.2.040. This is potentially problematic because the rule announced in *Terry v. Ohio* allows that "police officers may briefly detain a person for investigative purposes if they can point to 'specific and articulable facts' that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit *a crime.*" *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (emphasis added). However, the weight of authority interpreting *Terry* has held that stops based on reasonable suspicion are justified even when the defendant is only accused of ordinance violations, civil infractions, and traffic infractions. *See, e.g., United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008) ("We note that virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation."); *People v. Cannergeiter*, No. SX-15-CR-400, 2016 WL 5468374, at *7 (V.I. Super. Sept. 29, 2016) ("[T]he Fourth Amendment does not proscribe traffic stops aimed at investigating noncriminal, nontraffic civil infractions."); *State v. Colstad*, 659 N.W.2d 394, 398 (Wis. 2003) ("[W]e agree with the State's contention that a temporary investigative stop was justified by reasonable suspicion that Colstad violated a traffic ordinance."); *State v. Brown*, 694 A.2d 453, 455 (Me. 1997) ("In order to support a brief investigatory stop of a motor vehicle, such as the stop in this case, a police officer must have an articulable suspicion that criminal conduct or a civil violation has occurred, is occurring, or is about to occur.").

"An officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000). Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, but the Fourth Amendment does require at least a minimal level of objective justification for making the stop. *Id.* In order to find that sufficient reasonable suspicion existed to justify a stop, "a court must examine the 'totality of the circumstances' in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop only if it finds that 'the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing.'" *Monsivais*, 848 F.3d at 357 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

In the instant case, the tribal officers viewed surveillance footage showing Defendant picking up what appeared to be a rifle inside his car following a confrontation with a group of people. Defendant did not remove the rifle from his car, but he did hold it inside the car while standing just outside of the car as the group walked away. This conduct is clearly insufficient to constitute displaying a dangerous weapon "in a manner calculated to alarm" as specified by YDSP Peace Code § 4.4.010(D) and Texas Penal Code § 42.01(8) because the gun never left the car, the group of people never had an opportunity to see it, and Defendant appeared to purposefully keep the gun concealed within the car. *See Ex parte Poe*, 491 S.W.3d 348, 354–55 (Tex. App.—Beaumont 2016, pet. ref'd) (defining "in a manner calculated to alarm"). However, Defendant's conduct is sufficient to justify reasonable suspicion that he violated YDSP Peace Code § 4.4.020. Defendant appeared to possess a rifle. Further, it is arguable that he intended to use it in a manner capable of producing death or serious bodily injury. *See* YDSP Peace Code §

4.4.023. While Defendant argues that he only intended to move the rifle to allow himself to take a seat in the car, it is both reasonable and justifiable for the tribal officers to have interpreted him picking up the rifle as a plan to use it in self defense if the group chose to return and further threaten him. Using the rifle in self defense would entail potential death or serious bodily injury, making it a "dangerous weapon" under the YDSP Peace Code. Accordingly, the tribal officers had reasonable suspicion to briefly detain and question Defendant regarding his potential violation of YDSP Peace Code § 4.4.020.

## B. The Arrest[5]

Defendant asserts that, instead of performing a *Terry* stop, the tribal officers arrested him without probable cause in violation of the Fourth Amendment. Def.'s Brief at 6. The government contends that Officers Castillo and Alarcon performed a proper *Terry* stop and did not arrest Defendant until they had probable cause, which occurred after he resisted and attempted to flee. Govt.'s Resp. Brief at 5. The Court holds that the tribal officers effectuated an arrest of Defendant without probable cause in violation of the Fourth Amendment.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."

---

[5] The Court notes that the tribal officers cannot technically "arrest" Defendant because, to the Court's knowledge, he is not a Native American. *See Bressi v. Ford*, 575 F.3d 891, 896 (9th Cir. 2009) ("In the absence of some form of state authorization, however, tribal officers have no inherent power to arrest and book non-Indian violators."). However, the tribal officers do have authority to detain and eject non-Indian violators from the reservation or detain and transport non-Indian violators to the proper authorities. *Duro v. Reina*, 495 U.S. 676, 697 (1990) ("Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities."). The tribal officers detaining and ejecting a violator from the reservation or detaining and transporting a violator to the proper authorities are functional equivalents to an "arrest." *See United States v. Terry*, 400 F.3d 575, 579–80 (8th Cir. 2005) ("Because the power of tribal authorities to exclude non-Indian law violators from the reservation would be meaningless if tribal police were not empowered to investigate such violations, tribal police must have such power. When exercising this power, however, tribal officers must avoid effecting a constitutionally unreasonable search or seizure."). Thus, when the Court uses the term "arrest" in this Order, it is referring to those functional equivalents.

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* Probable cause exists when the totality of the facts and circumstances within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. *Lincoln v. Turner*, 874 F.3d 833, 842 (5th Cir. 2017). Further, an arrest occurs when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Id.* at 841. However, handcuffing a suspect or using force does not automatically convert an investigatory detention into an arrest requiring probable cause. *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993). "The relevant inquiry is whether the police were unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *Jordan*, 232 F.3d at 450.

In the instant case, the government tacitly admits that the tribal officers lacked probable cause at the time they approached Defendant by arguing that the officers' probable cause was created by Defendant resisting and attempting to flee from their alleged investigatory detention. *See* Govt.'s Resp. Brief at 9 ("While the transition from detention to arrest was brief, lasting only the seconds from when the officers first put their hands on the Defendant to when he began resisting, the Defendant's actions during those few seconds form the basis of a lawful arrest."). Thus, the Court must first determine if the tribal officers were effecting an arrest before Defendant's resistance began.

The seizure occurred when Defendant returned to the Entertainment Center, entered, sat down, and started playing a game. Officers Castillo and Alarcon subsequently approached Defendant, with Officer Alarcon serving as the "hands-on guy." Suppression Hr'g Tr. 122:1–13. Officer Castillo advanced with his gun drawn while Officer Alarcon approached Defendant, who

was still seated, grabbed him, attempted to pull him out of the chair, and attempted to handcuff him. *See id.* 122:1–124:6. At that point, Defendant pulled away and attempted to flee, leading to the tribal officers taking him to the ground and resulting in Defendant's injuries.

The question confronting the Court is whether the tribal officers used objectively reasonable force under the circumstances. *See Brown v. Lynch*, 524 F. App'x 69, 75 (5th Cir. 2013) ("An officer may use some degree of physical force to effect an investigatory stop, which force might, in some situations, include restraining the suspect with handcuffs. But such force must be objectively reasonable under the circumstances, and although an officer may resort to physical restraint in special circumstances, doing so is 'not ordinarily proper' without probable cause."). Here, the tribal officers approached Defendant with a gun drawn, immediately used physical force, and immediately attempted to resort to physical restraint. Defendant, at the time, was seated and calmly playing a game. The offense being investigated was only a civil infraction, and while Defendant had earlier been armed with a rifle, there was no indication that Defendant was armed when the tribal officers approached him. Further, Defendant displayed extraordinary restraint when he was previously confronted by the female in the parking lot. Nothing in his observed behavior would indicate that he was aggressive to the point of reasonably requiring immediate restraint.

Moreover, the cases cited by the government supporting the use of force and handcuffs typically involved suspects who were not complying with commands of the officers. *See, e.g., Jordan*, 232 F.3d at 450 ("Here the officers first asked Jordan to place his hands on the hood of the car, but he refused to do so. He was acting nervously, saying 'wait, wait' in response to the officers' questions, moving his hands erratically, and continuously looking over his shoulder. When one officer grabbed Jordan's arm and told him to calm down, Jordan jerked his hand away

and walked towards the officers in 'an aggressive-type manner.' Under those circumstances, we conclude that the officers did not act unreasonably in handcuffing Jordan long enough to frisk him."). In the instant case, the tribal officers did not give Defendant an opportunity to comply before resorting to force and physical restraint.[6] Thus, the tribal officers acted unreasonably in failing to use less intrusive procedures to safely conduct their investigation.[7]

Because this was a warrantless seizure, the government has the burden of proving that the arrest was constitutional. The government has failed to meet that burden here. Accordingly, the arrest of Defendant violated his Fourth Amendment rights, so the Court must exclude the fruits of that arrest.

## C. The Search of the Automobile

Defendant avers that the tribal officers violated his Fourth Amendment rights because they lacked the probable cause necessary to perform a warrantless search on the vehicle he drove to the Entertainment Center.[8] Def.'s Brief at 12–13. The government responds that the search

---

[6] Moreover, it is questionable if the tribal officers ever intended to perform an investigatory detention. The tribal officers testified that they were instructed to take Defendant into custody by their superior officer before they approached him. Suppression Hr'g Tr. 59:4–60:14 (Officer Castillo's testimony); *id.* 124:7–14 (Officer Alarcon's testimony). They did also testify that they interpreted that instruction to mean "detain" Defendant. *Id.* However, YDSP Peace Code § 4.5.022 defines "arrest" as "a person placed under restraint or taken into custody by any person exercising lawful authority."

[7] The government points to Defendant's status as a convicted felon as one justification for his treatment. *See* Suppression Hr'g Tr. 171:16–17. While the Court is mindful of Defendant's status and does not desire to encourage felons to possess firearms in violation of the law, the Court must draw its conclusions based on the facts known to the arresting officers at the time of the arrest. *Devenpeck*, 543 U.S. at 152. At the time of Defendant's arrest, the tribal officers did not know that Defendant was a felon. While it is not always optimal for the safety of the public, it is axiomatic that the protections of the Fourth Amendment to the United States Constitution apply to "the people," a group which includes convicted felons. *See* U.S. Const. amend. IV. Thus, the Court must apply the Constitution irrespective of Defendant's status as a convicted felon.

[8] Defendant also requests that the Court exclude the evidence using its supervisory powers because the YDSP Judicial Code does not allow searches under the automobile exception. Def.'s Brief at 13–15. *See also* YDSP Judicial Code § 2.2.096 (explaining the warrant requirement and listing any exceptions, which do not include the automobile exception). However, the general rule is that evidence

was justified by the automobile exception, the tribal officers had probable cause, and if the officers lacked probable cause at the time, the Court should not suppress the evidence because that evidence would have been inevitably discovered. Govt.'s Resp. Brief at 10–13. The Court holds that the tribal officers searched the vehicle without a warrant and without probable cause, in violation of Defendant's Fourth Amendment rights.

As a threshold matter, the Court must first consider the government's contention that Defendant has no standing to challenge the search of the automobile because Defendant does not own the automobile and did not have a sufficient privacy interest in the vehicle at the time it was searched. Govt.'s Am. Resp. at 8–10. Defendant testified that he switched vehicles with his girlfriend that night, as they had done on many other occasions, and he had the power to exclude others from the vehicle if he so wished. Suppression Hr'g Tr. 10:25–12:18. "In order to claim the Fourth Amendment's protection, a defendant must have a legitimate expectation of privacy in the invaded place. The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014). With regard to this issue, there is a Fifth Circuit case on point. In *United States v. Martinez*, the Fifth Circuit stated:

> Martinez challenges the search of the automobile as not incident to a lawful arrest nor incident to probable cause. The government initially challenges her standing, as a passenger, to contest the search of the car. At the suppression hearing, Martinez's boyfriend, the owner of the car, testified that she was using the car with his permission. We are satisfied that, as lawful possessor of the car, Martinez has standing to challenge the search.

---

will only be excluded in federal court when it violates federal protections. *United States v. Becerra-Garcia*, 397 F.3d 1167, 1173 (9th Cir. 2005) ("We have extended this principle to the context of tribal law, holding that the admissibility of evidence in federal court is determined without regard to tribal law."). *Cf. United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) ("[We] held that the exclusionary rule was created to discourage violations of federal law rather than violations of state law.").
Accordingly, the Court denies Defendant's request to exclude the evidence obtained in the search of the automobile because the search violated tribal law.

808 F.2d 1050, 1056 (5th Cir. 1987). *See also Byrd v. United States*, 138 S. Ct. 1518, 1528 (2018) ("The Court sees no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it, much as it did not seem to matter whether the friend of the defendant in *Jones* owned or leased the apartment he permitted the defendant to use in his absence."). Here, Defendant also had lawful possession and control over the car and the right to exclude others. Accordingly, the Court holds that Defendant has standing to challenge the search of the vehicle.

The Supreme Court has held that the search of an automobile can be reasonable without a warrant. *Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018). "Under the 'automobile exception' to the warrant requirement, officers may conduct a search if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011). As stated previously in this Order, probable cause exists when the totality of the facts and circumstances within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. *Turner, supra*, 874 F.3d at 842. Further, with regard to the inevitable discovery doctrine, the Fifth Circuit has stated that the government must prove (1) "a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct," (2) "that the leads making the discovery inevitable were possessed by the police at the time of the misconduct," and (3) "that the police also prior to the misconduct were actively pursuing the alternate line of investigation." *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985).

In the instant case, the government asserts that Defendant's "additional resistance and attempt to flee both justified the Defendant's arrest for violations of the Peace Code and, together with all the other circumstances, constituted probable cause to believe the Defendant was not in legal possession of the firearms contained in the vehicle." Govt.'s Resp. Brief at 11. The other circumstances the government refers to are Officer Alarcon seeing the rifle in Defendant's vehicle during a previous plain-look search and the surveillance video of Defendant appearing to pick up a rifle in his car earlier in the evening. The government's argument again tacitly admits that the tribal officers lacked probable cause if they performed an unconstitutional arrest because Defendant's resistance and flight would have been caused by the unconstitutional arrest. The Court previously ruled that the arrest violated Defendant's Fourth Amendment rights. Further, when the Court evaluates the totality of the circumstances absent Defendant's resistance and flight, the tribal officers did not have probable cause to search the vehicle without a warrant. While Officer Alarcon did see a rifle in Defendant's car through his plain-look search, neither the YSDP Peace Code nor Texas law prohibits a person from having a rifle in his car. Moreover, while the tribal officers saw Defendant on the surveillance video with what appeared to be a rifle, Defendant left the reservation, and no officers followed him. Officer Alarcon did not perform the plain-look search until Defendant returned at a later time, so it is unclear if any of the firearms in the vehicle were the one he allegedly possessed at an earlier time. It is the government's burden to prove that the tribal officers had probable cause, and the government has not carried that burden.

Furthermore, the government has also failed to carry its burden with regard to inevitable discovery. The first element the government must prove is "a reasonable probability that the evidence in question would have been discovered by lawful means but for the police

misconduct." *Cherry*, 759 F.2d at 1204. The government argues that the "evidence would inevitably have been discovered by either the Tribal Police or ATF Agents when they realized the Defendant was a convicted felon." Govt.'s Brief at 11. However, without the unconstitutional arrest of Defendant, the tribal officers would not have been alerted to his status as a convicted felon. Thus, the evidence would not have been discovered without the misconduct of the tribal officers.

As a final matter, the Court notes that even if the government had proven that the tribal officers had probable cause, the Court still would have ruled against the application of the automobile exception to this case.[9] This is because Defendant was only accused of violating YDSP Peace Code § 4.4.020, which does not carry a threat of imprisonment and is only a civil infraction subject to a civil assessment. In a case dealing with a civil forfeiture offense, the Supreme Court held:

> Even assuming, however, that the underlying facts would support a finding of this exigent circumstance, mere similarity to other cases involving the imminent destruction of evidence is not sufficient. The State of Wisconsin has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible. This is the best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest. Given this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant. To allow a warrantless home entry on these facts would be to approve unreasonable police behavior that the principles of the Fourth Amendment will not sanction.

*Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984). The same considerations exist in this case. While a person has a greater expectation of privacy in his home than his vehicle, allowing a warrantless search of a vehicle for a civil offense, for which imprisonment is not an option,

---

[9] Nevertheless, in such a scenario, the government likely would have prevailed under the inevitable discovery doctrine because the Court ruling that the tribal officers had probable cause would have entailed finding that Defendant's arrest was not unconstitutional.

would be to approve unreasonable police behavior that the principles of the Fourth Amendment do not sanction.[10] *Cf. State v. Duncan*, 43 P.3d 513, 518–19 (Wash. 2002) ("[S]ociety will tolerate a higher level of intrusion for a greater risk and higher crime than it would for a lesser crime. By logical extension this reasoning applies when a civil infraction is committed, as in this case. When investigating a civil infraction an officer is not seeking to arrest an individual, but rather to issue a citation. In light of the lower risk to society involved with civil infractions, the common law principle recognized in *Hornaday* suggests that a less intrusive procedure would be more acceptable than with the commission of a felony or even a misdemeanor."). A warrantless search of a personal vehicle is a significant intrusion on the privacy interests of the possessor of the vehicle. Such a significant intrusion is not justified by the civil infraction alleged here. Accordingly, the tribal officers' warrantless search of Defendant's vehicle violated his Fourth Amendment rights, so the Court must exclude the fruits of that search.

## D. The Statements to ATF Special Agent Rodriguez

Finally, Defendant argues that the Court should suppress the statements made by him to ATF Special Agent Rodriguez, as well as the evidence seized based on those statements, because

---

[10] With the decriminalization of marijuana in some states, there are recent decisions analyzing whether officers can use the automobile exception to search vehicles after observing an amount of marijuana that would only qualify as a civil infraction. *See, e.g., United States v. Martinez*, No. 17-CR-00257-LHK-1, 2018 WL 3861831, at *6 (N.D. Cal. Aug. 14, 2018). Those courts have tended to apply the automobile exception in the marijuana context because marijuana is always contraband due to its illegal status and if the officers locate larger amounts of marijuana in the vehicle, it could result in a misdemeanor or felony offense. *Id.*

However, the current case is distinguishable from those cases. Unlike marijuana, rifles can be legal to own and keep in a car. Thus, a rifle in a vehicle is not necessarily contraband. Further, there is no greater offense in the YDSP Peace Code that could offer imprisonment as a sanction. The YDSP Peace Code is a civil code, not a criminal code. Thus, tribal officers would need probable cause of a state or federal crime to justify a warrantless search under the automobile exception.

they constitute fruits of the poisonous tree.[11] Def.'s Brief at 15. The government's only argument against suppressing the statements and evidence is that Defendant's arrest was lawful. Govt.'s Am. Resp. at 12; Govt.'s Resp. Brief at 16–17. The Court holds that the statements and evidence obtained based on the statements are fruits of the poisonous tree and must be suppressed.

"[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Taylor*, 457 U.S. at 690 (internal quotation marks omitted). The Supreme Court has identified several factors that should be considered while determining whether a confession has been purged of the taint of an illegal arrest; these factors are: the temporal proximity of the arrest and confession, the presence of intervening circumstances, whether Miranda warnings were given, and the flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). Courts have also considered it significant when the interrogation was conducted in a different place with different people in a different atmosphere than the illegal search or seizure. *United States v. Cantu*, 426 F. App'x 253, 259 (5th Cir. 2011). "But the ultimate question remains the same: would the statement have been obtained regardless of the illegality?" *United States v. Beene*, 733 F. App'x 740, 750–52 (5th Cir. 2018).

In the instant case, the government has failed to carry its burden of proving that Defendant's statements and the evidence seized as a result of those statements are admissible. The Court has already rejected the government's only argument, that the arrest was not illegal.

---

[11] Defendant also challenged the voluntariness of his statements for the first time at the suppression hearing and in his subsequent briefing. *See, e.g.*, Def.'s Reply Brief at 9, ECF No. 45. However, Defendant did not raise this argument in either his Motion or his original Reply. Accordingly, the Court deems that argument to have been waived. *See, e.g., Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").

Moreover, when the Court considers the relevant factors, it is clear that suppression is the right result here. With regard to temporal proximity, only four to five hours elapsed between the time of Defendant's illegal arrest and the custodial interrogation. *See Taylor*, 457 U.S. at 690 (holding that six hours was insufficient when the defendant "was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup"); *United States v. Webster*, 750 F.2d 307, 324–25 (5th Cir. 1984) (suppressing the confession despite twelve hours elapsing between the illegal arrest and ten hours elapsing between a previous tainted statement and the custodial interrogation). Thus, temporal proximity weighs in Defendant's favor. *But see United States v. Mendez*, 885 F.3d 899, 912 (5th Cir. 2018) (noting that temporal proximity is not dispositive and is typically the least determinative factor involved).

Further, the intervening circumstances factor also weighs in Defendant's favor. While Defendant did spend around three of the four hours between the illegal arrest and custodial interrogation at the hospital, he was, to the Court's knowledge, in the continuous custody of a tribal officer, did not consult with a lawyer, was not able to contact family or friends, was getting the significant injuries to his arm treated, and was not brought before a neutral magistrate. *See Taylor*, 457 U.S. at 691–92 (holding that the opportunity to visit with a male companion and girlfriend for a short time while in custody was an insufficient intervening circumstance to purge the taint of the illegal arrest); *Webster*, 750 F.2d at 325 (noting that a car ride in the presence of law enforcement agents was an insufficient intervening event to purge the taint of the illegal arrest when the defendant "was in continuous custody, did not consult with a lawyer, was not able to contact family or friends, was not brought before a neutral magistrate, had likely been without sleep for a long period, and had already given one tainted statement"). However,

weighing in the government's favor is that Special Agent Rodriguez gave Defendant Miranda warnings and conducted the interrogation in a different place as a member of a different law enforcement agency than the one that committed the misconduct.

Nevertheless, the key question is if the confession is sufficiently an act of free will. Here, due to the illegal arrest and illegal searches, the tribal officers discovered illegal drugs on Defendant's person, seized illegally possessed weapons and drugs from Defendant's vehicle, determined that Defendant had a felony conviction, and caused significant injuries to Defendant's arm while arresting him. Defendant spent much of the four hours between the illegal arrest and custodial interrogation at the hospital in the custody of an officer getting treated for his injuries. As soon as the tribal officer returned Defendant to the reservation, he was interrogated by Special Agent Rodriguez. With the evidence illegally obtained from the searches, the injuries caused by the illegal arrest, and the relatively short time between the illegal arrest and the custodial interrogation, the Court cannot say that Defendant's statements would have been obtained regardless of the illegality. Defendant's confession was not an act of free will sufficient to purge the taint of the illegal arrest and searches. Accordingly, Defendant's statements to ATF Special Agent Rodriguez and the evidence obtained as a result of those statements are fruits of the poisonous tree, so the Court must suppress that evidence.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant Jonathan Moises Ramirez' "Motion to Suppress Evidence" (ECF No. 25) is **GRANTED**.

**IT IS FURTHER ORDERED** that the statements made to ATF Special Agent Rodriguez and the evidence obtained as a result of the tribal officers' illegal arrest of Defendant,

illegal search of Defendant's vehicle, and the statements made to ATF Special Agent Rodriguez are **SUPPRESSED**.

    So **ORDERED** and **SIGNED** this 2nd day of January 2019.

                                                      **DAVID C. GUADERRAMA**
                                                      **UNITED STATES DISTRICT JUDGE**